IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Franklin Stahl and Andy Stahl, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL BUREAU OF | ) |
| INVESTIGATION and U.S. | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

1.     This is an action under the Freedom of Information Act, 5 U.S.C. § 552, for injunctive and other appropriate relief and seeking the disclosure and release of agency records improperly withheld from plaintiffs by defendant Department of Justice ("DOJ") and its component agency the Federal Bureau of Investigation ("FBI").

**Jurisdiction and Venue**

2.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

3.     Plaintiff Franklin W. Stahl ("Dr. Stahl") is an American citizen, resident of the State of Oregon, and Mr. Stahl's father. Since it is relevant to the subject matter

of the documents being sought (as explained below), Dr. Stahl is Emeritus

Professor of Biology at the University of Oregon. He is a member of the National

Academy of Sciences, recipient of a MacArthur "genius award," the Thomas Hunt

Morgan Medal for Lifetime Contribution to Genetics, and several Guggenheim

Awards. He holds an A.B. from Harvard University, a Ph.D. from the University of

Rochester, and honorary doctorate degrees from Oakland University and

University of Rochester. Dr. Stahl has been a visiting professor at Hebrew

University in Jerusalem, Edinburgh University in Scotland, Cambridge University

in England, and the Massachusetts Institute of Technology.

4.      Dr. Stahl was a partner in the famous "Meselson-Stahl experiment"

demonstrating that DNA is replicated by a semiconservative mechanism, meaning

that each strand of the DNA serves as a template for production of a new strand.

This experiment provided the first empirical proof that the Watson-Crick "double-

helix" model of DNA reproduces as Watson and Crick had predicted. The

experiment removed any doubt that DNA contains the chemical blueprint for life

itself.

5.      The Meselson-Stahl experiment was also the first to use a new technique --

high-density ultra-centrifugation -- to concentrate and separate large biological

molecules. As discussed below, this pioneering work gives Dr. Stahl unusual

insight into the subject matter of the documents at issue in this case.

6.      Plaintiff Andy Stahl ("Mr. Stahl") is an American citizen and resident of the

State of Oregon. Mr. Stahl made the FOIA request at issue in this case on his and

his father's behalf. In his professional capacity, Mr. Stahl assists federal employee

whistleblowers, which skills have proven helpful in the pursuit of the matters

discussed herein. Mr. Stahl has previously assisted in FBI investigations of timber

theft and has testified as a DOJ expert witness in a federal tort claims case. His

career also includes successful enforcement of environmental laws in dozens of

cases, including the famous northern spotted owl campaign. His participation in

this case is as a concerned private citizen and son, and not a part of his

employment.

7.      Defendant Department of Justice (DOJ) is a Department of the Executive

Branch of the United States Government, and includes component entity FBI. The

DOJ is an agency within the meaning of 5 U.S.C. §552(f).

8.      Defendant Federal Bureau of Investigation (FBI) is an agency within the

meaning of 5 U.S.C. §552(f).

**FOIA Request and Defendants' Failure to Respond**

9.      On July 5, 2023, by electronic submission using the FBI's FOIA website,

Mr. Stahl submitted a Freedom of Information Act ("FOIA") request to the FBI for

"all documents, including emails, texts, phone memos, and reports, that include my

name ("Andy Stahl" or "Richard A. Stahl"). This includes email to or from the

following FBI agents: Gregory Leiman (glleiman@fbi.gov) and/or Gregory

Tarbert (gjtarbert@fbi.gov). I have sent each of these individuals email

correspondence regarding the 2017 Jewish Community Center bomb threats and

the 2001 anthrax attacks. I wish copies of my original emails and all subsequent

email correspondence within the FBI and with other government agencies that

mention my name."

10.    Mr. Stahl requested that his request be expedited because "[t]he information

requested is of national security importance and deserves full disclosure to the

American people." See Exhibit 1, Andy Stahl Declaration at Exhibit A.

11.    On July 11, 2023, the FBI acknowledged receipt of Mr. Stahl's FOIA

request, but did not provide any responsive documents, did not claim that no

responsive documents exist, nor claim that any responsive documents are exempt

from disclosure. The FBI's response instructed Mr. Stahl that if he was "not

satisfied" with the [FBI's] determination in response to his request, he may

"administratively appeal" within 90 days to the Director, Officer of Information

Policy, United States Department of Justice.

12.    On August 22, 2023, within the 90-day appeal window, Mr. Stahl

administratively appealed the FBI's "failure to provide any of the documents" he

had requested "within the twenty-day response time provided by FOIA."

13.     As of the date of this filing, neither the FBI nor DOJ has provided any responsive documents to Mr. Stahl, asserted that no responsive documents exist, nor claimed any FOIA exemptions.

14.     Mr. Stahl has exhausted his administrative remedies.

15.     Defendants FBI and DOJ have wrongfully withheld the requested records.

**The Unusual Subject Matter of the Requested Documents and Justification for Expedited Consideration by this Court**

**A. Jewish Community Center Bomb Threats**

16.     In the first quarter of 2017, an avalanche of hateful, anti-Semitic phone calls terrorized Jewish Community Centers throughout the United States. In late February of that year, in response to a question about the hate-filled calls, President Donald Trump is quoted as saying "Sometimes it's the reverse, to make people — or to make others — look bad." *See* "Trump is flirting with the idea that anti-Semitic incidents are false flags again," Washington Post, Feb. 28, 2017 (https://www.washingtonpost.com/news/the-fix/wp/2017/02/28/trump-is-reportedly-hinting-that-anti-semitic-incidents-are-false-flags-it-wouldnt-be-the-first-time/?postshare=5161488312708051).

17.     Dr. Stahl thought President Trump's characterization was plausible. Thus, he wrote a letter-to-the-editor of his hometown Eugene, Oregon's newspaper, which published it on March 12. The response from some of his University of Oregon colleagues and local community leaders was scathingly negative (e.g., Stahl is

either an anti-Semite or demented), as chronicled in the University's leading independent blog. https://uomatters.com/2017/03/poli-sci-professor-dissects-former-bio-professors-false-flag-letter.html#comments.

18.    On or about March 23, 2017, Israeli police arrested a man in Ashkelon, Israel, and accused him of having made the phone calls from an apartment in which his mother lives. https://www.haaretz.com/israel-news/2017-03-23/ty-article/cyber-police-arrest-teen-for-hundreds-of-bomb-threats-to-jewish-centers/0000017f-e0d1-d9aa-afff-f9d95d690000. The calls were made using Voice-Over-Internet-Protocol ("VOIP") technology from several computers in the apartment's bedroom, including one or more antennas used to access other people's networks to avoid detection. Israeli media, which has been banned by its government from reporting the man's identity, reported that he was exempt from military service, had been homeschooled, was of various ages, suffered from various medical conditions that affected his cognition, and spent his early childhood in the U.S. or in Israel.

19.    Although Dr. Stahl's thesis, inspired by President Trump's hint, had proved correct -- the bomb threat calls were a "false flag," not a rise in U.S. domestic anti-Semitism -- Dr. Stahl was skeptical that the official story was accurate. Thus, he set out to determine the truth of the matter and conscripted his son, Mr. Stahl, to assist him.

20.     On June 8, 2017, through their Seattle-based attorney, John Phillips, the Stahls emailed the results of their investigation to the U.S. Department of Justice. See Exhibit 2, Franklin W. Stahl Declaration at Exhibit A. In sum, the letter's evidence suggested the arrestee's mother, Dr. Tamar Kadar, was the perpetrator of the hate-filled phone calls.

21.     Of particular note, the Stahls' June 8 letter put forward a readily testable hypothesis, the result of which could refute entirely their thesis: If an Illinois resident named 'Michael R. Kadar' **did not** fly from Chicago to Tel Aviv during a 3-day window (on or about March 22) following Mr. Kadar's release from an Illinois jail, and before the arrest in Ashkelon of the alleged perpetrator (of the same name), then Dr. Stahl's thesis should be disregarded. However, if Michael R. Kadar did make that flight, the unlikely coincidence (name, date, destination) leads ineluctably to the conclusion that Michael Kadar did not make the January-March, 2017, hateful phone calls as he was in a U.S. jail during that period.

22.     The U.S. government's response to this information proved instructive.

23.     Within minutes of receiving the emailed information, DOJ attorney Ryan Dickey, one of the email recipients, called attorney John Phillips. As recounted by Mr. Phillips in an email to Mr. Stahl (See Exhibit 1, Andy Stahl Declaration, at Exhibit B):

*I got a call from Ryan Dickey. He was involved in the investigation to the Criminal Complaints. He wanted to know what this was about before he opened the pdf. I*

*explained. He seemed genuinely interested in the suggestive information and he told me that he would open and read the letter and would insure that the information is shared with the appropriate folks.*

24.    On July 25, 2017, John Phillips sent the following email to Mr. Stahl:

*Andy I got a call from Greg Leiman, an FBI agent who wanted to interview me regarding Michael Kadar.  I told him I had no knowledge beyond the the (sic) contents of the letter but that my clients may have more information.  I told him I would check to see if you are willing to be interviewed.  He understands that you desired anonymity given the possible publicity/blowback, but I told him you might be willing to talk now that you know the FBI is investigating.  Let me know what you would like to do in response to this request.*

25.    Mr. Leiman promptly followed up his phone call with this email message to

John Phillips:

*-----Original Message-----*
*From: Leiman, Gregory L. (SE) (FBI) [[mailto:glleiman@fbi.gov](mailto:glleiman@fbi.gov)]*
*Sent: Tuesday, July 25, 2017 11:33 AM*
*To: John Phillips*
*Subject: Michael Kadar*

*Hi John,*

*Please find my contact information below and advise when your clients will be available for a phone conference. Looking forward to meeting you.*

*Best,*

*Greg*

*Greg Leiman*
*Special Agent*
*FBI Seattle*
*(206)300-5467*

26.     On July 25, 2017, attorney John Phillips and FBI Special Agent Leiman had

the following email conversation:

-----*Original Message*-----
*From: John Phillips [mailto:jphillips@jphillipslaw.com]*
*Sent: Tuesday, July 25, 2017 3:46 PM*
*To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>*
*Subject: RE: Michael Kadar*

*Hi, Greg.  My clients would be happy to talk with you.  Their concern for privacy lies in part with unease over whether the government wants to talk with them for the purpose of discrediting them.  If the FBI has confirmed that Michael Kadar did in fact travel to Israel on or about March 22, then my clients have no problem being interviewed by you.  If the FBI has not confirmed that key piece of the evidence then my clients feel that an interview would be premature.  If you can confirm that Kadar did travel to Israel in March, then my clients will be confident in the bona fides of the investigation and share with you all the information they have gathered.  I look forward to hearing from you.*

-----*Original Message*-----
*From: Leiman, Gregory L. (SE) (FBI) [mailto:glleiman@fbi.gov]*
*Sent: Tuesday, July 25, 2017 3:53 PM*
*To: John Phillips*
*Subject: RE: Michael Kadar*

*John,*

*With respect to your clients, the FBI cannot disclose investigative details such as the whereabouts or travel history of any individual. I would still encourage your clients to share any information they believe to be relevant to this matter.*

*Best,*

*Greg*

-----*Original Message*-----

*From: John Phillips [mailto:jphillips@jphillipslaw.com]*
*Sent: Tuesday, July 25, 2017 4:04 PM*
*To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>*
*Subject: RE: Michael Kadar*

*I understand.  Can you share with them that the FBI has looked into that travel issue before seeking to interview them?*

**From:** *"Leiman, Gregory L. (SE) (FBI)" <glleiman@fbi.gov>*
**Date:** *July 25, 2017 at 4:08:02 PM PDT*
**To:** *John Phillips <jphillips@jphillipslaw.com>*
**Subject: RE: Michael Kadar**
*John,*

*The most I can say is that we have conducted an extremely thorough investigation. I'm sure your clients can understand the need to protect the integrity of a pending investigation.*

*Best,*

*Greg*

27.     In response, John Phillips sent the following message to Agent Leiman and

received the reply below:

*-----Original Message-----*
*From: John Phillips [mailto:jphillips@jphillipslaw.com]*
*Sent: Tuesday, July 25, 2017 4:26 PM*
*To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>*
*Subject: RE: Michael Kadar*

*Greg, my clients are Andy Stahl and his father Professor Stahl.  They would be happy to share what they have learned.  How would you like to proceed?*

**From:** *"Leiman, Gregory L. (SE) (FBI)" <glleiman@fbi.gov>*
**Date:** *July 25, 2017 at 4:29:10 PM PDT*
**To:** *John Phillips <jphillips@jphillipslaw.com>*
**Subject: RE: Michael Kadar**

*John,*

*If your clients are not able to meet in person, we can do a phone conference at your office this Friday, 7/28/17. Alternatively, if they wish to be interviewed in person I can arrange for an agent to meet them in the city where they reside.*

*Best,*

*Greg*

28.     Notwithstanding Agent Leiman's initial interest, and repeated offers to meet, the FBI never interviewed Dr. Stahl nor Mr. Stahl on this matter.

## B. 2001 Anthrax Terrorist Letters

29.     Dr. Stahl's further inquiries into the JCC bomb threats led him to question how Michael R. Kadar came to enjoy dual Israeli-American citizenship, as reported in DOJ's criminal indictment. The readiest explanation for dual citizenship is birth in the U.S. to a foreign national. The Stahls' June 17, 2017, letter to DOJ noted that Michael R. Kadar had received a state court *Padilla* warning that a conviction on Kadar's low-level crimes could lead to his deportation as a foreign national. However, there was a discrepancy between Israeli media reports of Michael Kadar's age (17-18 years old, which could justify his trial in Israel as a juvenile) versus the age reported in Illinois court records for Michael R. Kadar (10 years older).

30.     Dr. Stahl turned to Dr. Tamar Kadar's research publications to track her travel. Sure enough, Dr. Kadar had been in the United States the same year that

Michael R. Kadar was born. While employed by Israel's Institute for Biological Research ("IIBR"), she was a visiting scientist at the United States Army Medical Research Institute of Infectious Diseases ("USAMRIID") and associated federal defense agencies (e.g., Uniformed Services University) during the time period Michael R. Kadar was born.

31.    Incident to his investigation into Michael R. Kadar's birth, Dr. Stahl uncovered a compelling reason that our government and Israel would wish to keep Dr. Tamar Kadar out of the public spotlight.

32.    Dr. Stahl's discovery is set forth in a memorandum he emailed on or about September 15, 2019, to dozens of scientists associated with USAMRIID. Exhibit 2, Franklin W. Stahl Declaration at Exhibit B. The memorandum's timeline summarizes the explosive political significance of his findings:

Timeline
The evidence discussed above explains that the IIBR developed anthrax that bears a striking similarity to that used against the U.S. in 2001. The following timeline explores how and why this was done.
**1990**: An IIBR employee, Dr. Tamar Kadar (associated with my "seemingly unrelated inquiry") is briefly on leave from IIBR and affiliated with the Uniformed Services University's ("USU") Department of Neurology in Bethesda. USU has a close working relationship with USAMRIID.
**1992**: Anthrax and other pathogens are reported to have "disappeared" from USAMRIID "in the early 1990s..."
**2000**: IIBR reports it has developed an anthrax vaccine that provides "long and lasting immunity" and "efficient protection from lethal challenge." Handling anthrax without personal protective equipment could be suicidal if unvaccinated.
**2001**: One week after 9/11, letters containing highly concentrated virulent anthrax are posted in a Princeton, N.J., public mailbox. Five people died from anthrax

exposure, including two postal workers, illustrating the importance of vaccination for the person(s) who handled and mailed the letters.

**2002**: Citing Saddam Hussein's development of biological and chemical weapons of mass destruction, Israel urges U.S. to attack Iraq.

**2003**: Secretary of State Colin Powell makes the U.S. case for invading Iraq: "Less than a teaspoonful of dry anthrax in an envelope shut down the United States Senate in the fall of 2001."

**April, 2019**: The U.S. Department of Justice is notified that Dr. Kadar was in Bethesda in 1990 with access to the USAMRIID.

**July, 2019**: USAMRIID is closed indefinitely. A USAMRIID public affairs official initially cites "national security" for this unprecedented shutdown, but, later, points to a faulty water treatment system known since 2018 to pose "no risk to public health."

33.    Dr. Stahl's discovery hinges on his intimate knowledge of bacteriology and its scientific methods, including the ultra-high centrifugation density gradient method he co-developed with his colleague Dr. Matt Meselson. This method is the standard means by which anthrax bacteria are purified and concentrated. Inexplicably, however, there is no chemical forensic evidence that the common density gradient method was used to concentrate the anthrax deployed against the United States in 2001. When asked to investigate the 2001 anthrax attacks, the National Academy of Sciences ("NAS") could only scratch its head regarding how the anthrax had been concentrated.

34.    The method of concentration was not the only forensic mystery that stumped the NAS's study committee. The committee also could not explain the high level of silicon and presence of iron in the anthrax. These three mysteries have remained unresolved (at least publicly) until Dr. Stahl found the missing link.

35.     The missing link is a 2006 research paper published in the Journal of
Analytical Chemistry. Exhibit 2, Franklin W. Stahl Declaration at Exhibit C). The
paper titled "Concentration of *Bacillus* Spores by Using Silica Magnetic Particles"
is authored by four scientists then employed by the IIBR. The paper explains how
commercially available silicon/iron nanoparticles can be used to concentrate
anthrax ("*Bacillus*" is the Latin name for anthrax). The paper presents two
techniques (sonication or a cationic lipid) for infiltrating the magnetic
nanoparticles under the anthrax outer coat ("exposporium") where the particles
adhere to the bacteria's inner coat. A magnet is then used to pull the iron-labeled
bacterial particles together, i.e., concentrates them. As described by the paper, the
"method is simple, efficient, easy to operate, and fast." This technique would leave
no forensic evidence consistent with high-speed centrifugation in a density
gradient – the traditional anthrax concentration method. However, the technique
would leave lots of silica and iron in the bacteria.

36.     To confirm Dr. Stahl's theory, Mr. Stahl contacted one of the paper's authors
– Dr. Eran Zahavy – through Dr. Zahavy's LinkedIn profile, which at that time
indicated that Dr. Zahavy no longer worked at IIBR. On August 21, 2019, Mr.
Stahl and Dr. Zahavy had a conversation over Skype about these matters.

37.     Dr. Zahavy told Mr. Stahl that while he was a visiting professor at UC San
Diego in 2006, Dr. Zahavy briefed "key U.S. scientists" on the 2006 paper and its

utility for concentrating anthrax. Dr. Zahavy also confirmed that Dr. Tamar Kadar

has a distinct speech impediment (the FBI's JCC indictment of Michael Kadar

reports the female voice on the phone calls has a distinct speech impediment),

which is further evidence that Dr. Kadar, not her son Michael, made the JCC bomb

threat calls.

38.     On or about September 7, 2007, Dr. Bruce Ivins, the second man the FBI

accused of sending the anthrax letters (the FBI had previously insinuated that Dr.

Steven Hatfill, a USAMRIID employee in the late 1990s, was the anthrax criminal

– an accusation that cost the government $5.8 million to settle after the FBI

admitted it had the wrong suspect) writes the following email to himself:

*Yes! Yes! Yes!!!!!!! I finally know who mailed the anthrax letters in the fall of
2001. I've pieced it together! Now we can finally get this over and done with. I'm
not looking forward to everybody getting dragged through the mud, but at least it
will be over. Finally! I should have it TOTALLY nailed down within the month. I
should have been a private eye!!!!*

39.     On July 29, 2008, before the FBI accused or DOJ indicted him for the

anthrax letter crimes, Dr. Ivins died. On August 8, 2008, the FBI and DOJ declared

Dr. Ivins to be the anthrax perpetrator and closed its investigation into the matter.

**Requested Relief**

WHEREFORE, Plaintiff prays that this Court:

1.     Order defendants to disclose the requested records in their entireties and

make copies available to Plaintiffs;

2.      Provide for expeditious proceedings in this action;

3.      Award Plaintiffs their costs and reasonable attorney's fees incurred in this

action; and

4.      Grant such other relief as the Court may deem just and proper.

Respectfully submitted this 1st day of October, 2023,

> /s/Timothy M. Bechtold
> BECHTOLD LAW FIRM, PLLC
> 317 East Spruce Street
> P.O. Box 7051
> Missoula, MT 59807-7051
> 406-721-1435
> tim@bechtoldlaw.net
>
> Attorney for Plaintiffs

# Exhibit 1

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Franklin Stahl and Andy Stahl, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL BUREAU | ) |
| OF INVESTIGATION et | ) |
| al., | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF ANDY STAHL

Pursuant to 28 USC §1746, I, ANDY STAHL, declare as follows:

1.      My name is Andy Stahl. I am an American citizen and resident of the State of Oregon. I made the FOIA request at issue in this case on my and my father's behalf. In my professional capacity, I assist federal employee whistleblowers, which skills have proven helpful in the pursuit of the matters discussed herein. I have previously assisted in FBI investigations of timber theft and testified as a DOJ expert witness in a federal tort claims case. My career also includes successful enforcement of environmental laws in dozens of cases, including the famous northern spotted owl campaign. My participation in this case is as a concerned private citizen and son, and not a part of my employment.

2.      On July 5, 2023, by electronic submission using the FBI's FOIA website, I submitted a Freedom of Information Act ("FOIA") request to the FBI for "all

1

documents, including emails, texts, phone memos, and reports, that include my

name ("Andy Stahl" or "Richard A. Stahl"). This includes email to or from the

following FBI agents: Gregory Leiman (glleiman@fbi.gov) and/or Gregory

Tarbert (gjtarbert@fbi.gov). I have sent each of these individuals email

correspondence regarding the 2017 Jewish Community Center bomb threats and

the 2001 anthrax attacks. I wish copies of my original emails and all subsequent

email correspondence within the FBI and with other government agencies that

mention my name." *See* FOIA request attached as Exhibit A.

3.      I requested that my request be expedited because "[t]he information

requested is of national security importance and deserves full disclosure to the

American people." *Id.*

4.      On July 11, 2023, the FBI acknowledged receipt of my FOIA request, but

did not provide any responsive documents, did not claim that no responsive

documents exist, nor claim that any responsive documents are exempt from

disclosure. The FBI's response instructed me that if I was "not satisfied" with the

[FBI's] determination in response to my request, I may "administratively appeal"

within 90 days to the Director, Officer of Information Policy, United States

Department of Justice.

5.      On August 22, 2023, within the 90-day appeal window, I administratively appealed the FBI's "failure to provide any of the documents" I had requested "within the twenty-day response time provided by FOIA."

6.      As of the date of this filing, neither the FBI nor DOJ has provided any responsive documents, asserted that no responsive documents exist, nor claimed any FOIA exemptions.

7.      At his request, I have assisted my father with his investigations into matters related to the documents sought in this case.

8.      Attached as Exhibit B is email correspondence related to the documents sought in this case. Exhibit B begins with an email message from John Phillips to me:

*I got a call from Ryan Dickey. He was involved in the investigation to the Criminal Complaints. He wanted to know what this was about before he opened the pdf. I explained. He seemed genuinely interested in the suggestive information and he told me that he would open and read the letter and would insure that the information is shared with the appropriate folks.*

9.      On July 25, 2017, John Phillips sent me following email:

*Andy I got a call from Greg Leiman, an FBI agent who wanted to interview me regarding Michael Kadar.  I told him I had no knowledge beyond the the (sic) contents of the letter but that my clients may have more information.  I told him I would check to see if you are willing to be interviewed.  He understands that you desired anonymity given the possible publicity/blowback, but I told him you might be willing to talk now that you know the FBI is investigating.  Let me know what you would like to do in response to this request.*

3

10.    Mr. Leiman promptly followed up his phone call with this email message to

John Phillips:

-----Original Message-----
From: Leiman, Gregory L. (SE) (FBI) [mailto:glleiman@fbi.gov]
Sent: Tuesday, July 25, 2017 11:33 AM
To: John Phillips
Subject: Michael Kadar

Hi John,

Please find my contact information below and advise when your clients will be
available for a phone conference. Looking forward to meeting you.

Best,

Greg

Greg Leiman
Special Agent
FBI Seattle
(206)300-5467


11.    On July 25, 2017, attorney John Phillips and FBI Special Agent Leiman had

the following email conversation:

-----Original Message-----
From: John Phillips [mailto:jphillips@jphillipslaw.com]
Sent: Tuesday, July 25, 2017 3:46 PM
To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>
Subject: RE: Michael Kadar

Hi, Greg.  My clients would be happy to talk with you.  Their concern for privacy
lies in part with unease over whether the government wants to talk with them for
the purpose of discrediting them.  If the FBI has confirmed that Michael Kadar did
in fact travel to Israel on or about March 22, then my clients have no problem
being interviewed by you.  If the FBI has not confirmed that key piece of the

4

*evidence then my clients feel that an interview would be premature.  If you can
confirm that Kadar did travel to Israel in March, then my clients will be confident
in the bona fides of the investigation and share with you all the information they
have gathered.  I look forward to hearing from you.*
*-----Original Message-----*
*From: Leiman, Gregory L. (SE) (FBI) [mailto:glleiman@fbi.gov]*
*Sent: Tuesday, July 25, 2017 3:53 PM*
*To: John Phillips*
*Subject: RE: Michael Kadar*

*John,*

*With respect to your clients, the FBI cannot disclose investigative details such as
the whereabouts or travel history of any individual. I would still encourage your
clients to share any information they believe to be relevant to this matter.*

*Best,*

*Greg*

*-----Original Message-----*
*From: John Phillips [mailto:jphillips@jphillipslaw.com]*
*Sent: Tuesday, July 25, 2017 4:04 PM*
*To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>*
*Subject: RE: Michael Kadar*

*I understand.  Can you share with them that the FBI has looked into that travel
issue before seeking to interview them?*

*From: "Leiman, Gregory L. (SE) (FBI)" <glleiman@fbi.gov>*
*Date: July 25, 2017 at 4:08:02 PM PDT*
*To: John Phillips <jphillips@jphillipslaw.com>*
*Subject: RE: Michael Kadar*
*John,*

*The most I can say is that we have conducted an extremely thorough investigation.
I'm sure your clients can understand the need to protect the integrity of a pending
investigation.*

*Best,*

*Greg*

12.     In response, John Phillips sent the following message to Agent Leiman and

received the reply below:

*-----Original Message-----*
*From: John Phillips [mailto:jphillips@jphillipslaw.com]*
*Sent: Tuesday, July 25, 2017 4:26 PM*
*To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>*
*Subject: RE: Michael Kadar*

*Greg, my clients are Andy Stahl and his father Professor Stahl. They would be happy to share what they have learned. How would you like to proceed?*

***From:*** *"Leiman, Gregory L. (SE) (FBI)" <glleiman@fbi.gov>*
***Date:*** *July 25, 2017 at 4:29:10 PM PDT*
***To:*** *John Phillips <jphillips@jphillipslaw.com>*
***Subject: RE: Michael Kadar***
*John,*

*If your clients are not able to meet in person, we can do a phone conference at your office this Friday, 7/28/17. Alternatively, if they wish to be interviewed in person I can arrange for an agent to meet them in the city where they reside.*

*Best,*

*Greg*

13.     Notwithstanding Agent Leiman's initial interest, and repeated offers to meet,

the FBI never interviewed me or my father on this matter.

14.     To confirm my father's anthrax theory, I contacted one of the 2016 paper's

authors -- Dr. Eran Zahavy -- through Dr. Zahavy's LinkedIn profile, which at that

time indicated that Dr. Zahavy no longer worked at IIBR. On August 21, 2019, I and Dr. Zahavy had a conversation over Skype about these matters.

15.     Dr. Zahavy told me that while he was a visiting professor at UC San Diego in 2006, Dr. Zahavy briefed "key U.S. scientists" on the 2006 paper and its utility for concentrating anthrax. Dr. Zahavy also confirmed to me that Dr. Tamar Kadar has a distinct speech impediment (the FBI's JCC indictment of Michael Kadar reports the female voice on the phone calls has a distinct speech impediment), which is further evidence that Dr. Kadar, not her son Michael, made the JCC bomb threat calls.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this /st day of October, 2023, in Eugene, Oregon.


_____
Andy Stahl

7

# Andy Stahl Declaration Exhibit A

## Individual Information

| | |
|---|---|
| **Prefix** | |
| **First Name** | Andy |
| **Middle Name** | |
| **Last Name** | Stahl |
| **Suffix** | |
| **Email** | stahlandy@comcast.net |
| **Phone** | 541-484-1440 |
| **Location** | United States |

## Domestic Address

| | |
|---|---|
| **Address Line 1** | |
| **Address Line 2** | |
| **City** | Eugene |
| **State** | Oregon |
| **Postal** | 97405 |

## Agreement to Pay

| | |
|---|---|
| **How you will pay** | I am willing to pay additional fees and will enter the maximum amount I am willing to pay in the box below. |
| **Allow up to $** | 100 |

## Privacy Act

| | |
|---|---|
| **US Citizen** | True |
| **Prefix** | |
| **First Name** | Andy |
| **Middle Name** | |
| **Last Name** | Stahl |
| **Suffix** | |
| **Date of Birth** | 1956/04/02 |
| **Place of Birth** | Chicago, Illinois |
| **Additional Information** | This request follows up on #1595648-000. I wish all documents, including emails, texts, phone memos, and reports, that include my name ("Andy Stahl" or "Richard A. Stahl"). This includes email to or from the following FBI agents: Gregory Leiman (glleiman@fbi.gov) and/or Gregory Tarbert (gjtarbert@fbi.gov). I have sent each of these individuals email correspondence regarding the 2017 Jewish Community Center bomb threats and the 2001 anthrax attacks. I wish copies of my original emails and all subsequent email correspondence within the FBI and with other government agencies that mention my name. |

## Expedite

| | |
|---|---|
| **Expedite Reason** | The information requested is of national security importance and deserves full disclosure to the American people. |

# Andy Stahl Declaration Exhibit B

From: John Phillips <jphillips@jphillipslaw.com>
Subject: RE: Kadar Indictments
Date: June 8, 2017 at 1:21:55 PM PDT
To: Andy Stahl <stahlandy@comcast.net>

I got a call from Ryan Dickey. He was involved in the investigation leading to the
Criminal Complaints.   He wanted to know what this was about before he opened
the pdf.  I explained.  He seemed genuinely interested in the suggestive
information and he told me that he would open and read the letter and would insure
that the information is shared with the appropriate folks.

From: John Phillips <jphillips@jphillipslaw.com>
Subject: FW: Michael Kadar
Date: July 25, 2017 at 3:17:57 PM PDT
To: "Andy Stahl (stahlandy@comcast.net)" <stahlandy@comcast.net>

Andy I got a call from Greg Leiman, an FBI agent who wanted to interview me
regarding Michael Kadar.  I told him I had no knowledge beyond the the contents
of the letter but that my clients may have more information.  I told him I would
check to see if you are willing to be interviewed.  He understands that you desired
anonymity given the possible publicity/blowback, but I told him you might be
willing to talk now that you know the FBI is investigating.  Let me know what you
would like to do in response to this request.

-----Original Message-----
From: Leiman, Gregory L. (SE) (FBI) [mailto:glleiman@fbi.gov]
Sent: Tuesday, July 25, 2017 11:33 AM
To: John Phillips
Subject: Michael Kadar

Hi John,

Please find my contact information below and advise when your clients will be
available for a phone conference. Looking forward to meeting you.

Best,

Greg

Greg Leiman

-----Original Message-----
From: John Phillips [mailto:jphillips@jphillipslaw.com]
Sent: Tuesday, July 25, 2017 3:46 PM
To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>
Subject: RE: Michael Kadar

Hi, Greg.  My clients would be happy to talk with you.  Their concern for privacy lies in part with unease over whether the government wants to talk with them for the purpose of discrediting them.  If the FBI has confirmed that Michael Kadar did in fact travel to Israel on or about March 22, then my clients have no problem being interviewed by you.  If the FBI has not confirmed that key piece of the evidence then my clients feel that an interview would be premature.  If you can confirm that Kadar did travel to Israel in March, then my clients will be confident in the bona fides of the investigation and share with you all the information they have gathered.  I look forward to hearing from you.

-----Original Message-----
From: Leiman, Gregory L. (SE) (FBI) [mailto:glleiman@fbi.gov]
Sent: Tuesday, July 25, 2017 3:53 PM
To: John Phillips
Subject: RE: Michael Kadar

John,

With respect to your clients, the FBI cannot disclose investigative details such as the whereabouts or travel history of any individual. I would still encourage your clients to share any information they believe to be relevant to this matter.

Best,

Greg

-----Original Message-----
From: John Phillips [mailto:jphillips@jphillipslaw.com]
Sent: Tuesday, July 25, 2017 4:04 PM
To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>
Subject: RE: Michael Kadar

I understand.  Can you share with them that the FBI has looked into that travel issue before seeking to interview them?


**From:** "Leiman, Gregory L. (SE) (FBI)" <glleiman@fbi.gov>
**Date:** July 25, 2017 at 4:08:02 PM PDT
**To:** John Phillips <jphillips@jphillipslaw.com>
**Subject: RE: Michael Kadar**

John,

The most I can say is that we have conducted an extremely thorough investigation. I'm sure your clients can understand the need to protect the integrity of a pending investigation.

Best,

Greg


-----Original Message-----
From: John Phillips [mailto:jphillips@jphillipslaw.com]
Sent: Tuesday, July 25, 2017 4:26 PM
To: Leiman, Gregory L. (SE) (FBI) <glleiman@fbi.gov>
Subject: RE: Michael Kadar

Greg, my clients are Andy Stahl and his father Professor Stahl.  They would be happy to share what they have learned.  How would you like to proceed?

**From:** "Leiman, Gregory L. (SE) (FBI)" <glleiman@fbi.gov>
**Date:** July 25, 2017 at 4:29:10 PM PDT
**To:** John Phillips <jphillips@jphillipslaw.com>
**Subject: RE: Michael Kadar**

John,

If your clients are not able to meet in person, we can do a phone conference at your office this Friday, 7/28/17. Alternatively, if they wish to be interviewed in person I can arrange for an agent to meet them in the city where they reside.

Best,

Greg


Special Agent
FBI Seattle
(206)300-5467

# Exhibit 2

IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Franklin Stahl and Andy Stahl, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL BUREAU OF | ) |
| | ) |
| INVESTIGATION et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

DECLARATION OF FRANKLIN W. STAHL

Pursuant to 28 USC §1746, I, FRANKLIN W. STAHL, declare as follows:

1.      My name is Franklin W. Stahl. I am an American citizen, resident of the

State of Oregon, and Andy Stahl's father. I am an Emeritus Professor of Biology at

the University of Oregon. I am a member of the National Academy of Sciences,

recipient of a MacArthur "genius award," the Thomas Hunt Morgan Medal for

Lifetime Contribution to Genetics, and several Guggenheim Awards. I hold an

A.B. from Harvard University, a Ph.D. from the University of Rochester, and

honorary doctorate degrees from Oakland University and University of Rochester.

I have been a visiting professor at Hebrew University in Jerusalem, Edinburgh

University in Scotland, Cambridge University in England, and the Massachusetts

Institute of Technology.

2.     I and Matthew Meselson performed the "Meselson-Stahl experiment," which demonstrated that DNA is replicated by a semiconservative mechanism, meaning that each strand of the DNA serves as a template for production of a new strand. This experiment provided the first empirical proof that the Watson-Crick "double-helix" model of DNA reproduces as Watson and Crick had predicted. The experiment removed any doubt that DNA contains the chemical blueprint for life itself.

3.     The Meselson-Stahl experiment was also the first to use a new technique -- high-density ultra-centrifugation -- to concentrate and separate large biological molecules, which is relevant to the documents at issue in this case.

4.     In the first quarter of 2017, an avalanche of hateful, anti-Semitic phone calls terrorized Jewish Community Centers throughout the United States. In late February of that year, in response to a question about the hate-filled calls, I read a news article quoting President Donald Trump saying "Sometimes it's the reverse, to make people — or to make others — look bad." *See* "Trump is flirting with the idea that anti-Semitic incidents are false flags again," Washington Post, Feb. 28, 2017 (https://www.washingtonpost.com/news/the-fix/wp/2017/02/28/trump-is-reportedly-hinting-that-anti-semitic-incidents-are-false-flags-it-wouldnt-be-the-first-time/?postshare=5161488312708051).

5.     I thought President Trump's characterization was plausible. Thus, I wrote a letter-to-the-editor of my hometown *Register-Guard*, which published it on March 12. The response from some of my University of Oregon colleagues and local community leaders was scathingly negative (e.g., Stahl is either an anti-Semite or demented), as chronicled in the University's leading independent blog. https://uomatters.com/2017/03/poli-sci-professor-dissects-former-bio-professors-false-flag-letter.html#comments.

6.     Two weeks thereafter, on or about March 23, 2017, Israeli police arrested a man in Ashkelon, Israel, and accused him of having made the phone calls from an apartment in which his mother lives. https://www.haaretz.com/israel-news/2017-03-23/ty-article/cyber-police-arrest-teen-for-hundreds-of-bomb-threats-to-jewish-centers/0000017f-e0d1-d9aa-afff-f9d95d690000. The calls were made using Voice-Over-Internet-Protocol ("VOIP") technology from several computers in the apartment's bedroom, including one or more antennas used to access other people's networks to avoid detection. Israeli media, which was banned by its government from reporting the man's identity, reported that he was exempt from military service, had been homeschooled, was of various ages, suffered from various medical conditions that affected his cognition, and spent his early childhood in the U.S. or in Israel.

7.     Although my thesis, inspired by President Trump's hint, had proved correct -
- the bomb threat calls were a "false flag," not a rise in U.S. domestic anti-
Semitism -- I was skeptical that the official story was accurate. Thus, I set out to
determine the truth of the matter and conscripted my son to assist me.

8.     On June 8, 2017, through our Seattle-based attorney, John Phillips, we
emailed the results of our investigation to the U.S. Department of Justice. Exhibit
A, attached here. In sum, the letter's evidence suggested the arrestee's mother, Dr.
Tamar Kadar, was the perpetrator of the hate-filled phone calls.

9.     Our June 8 letter put forward a readily testable hypothesis, the result of
which could refute entirely our thesis: If an Illinois resident named 'Michael R.
Kadar' **did not** fly from Chicago to Tel Aviv during a 3-day window (on or about
March 22) following Mr. Kadar's release from an Illinois jail, and before the arrest
in Ashkelon of the alleged perpetrator (of the same name), then our thesis should
be disregarded. However, if Michael R. Kadar did make that flight, the unlikely
coincidence (name, date, destination) leads ineluctably to the conclusion that
Michael Kadar did not make the January-March, 2017, hateful phone calls as he
was in a U.S. jail during that period.

10.     The U.S. government's response to this information proved instructive, as
detailed in my son's declaration filed contemporaneously with our complaint.

11.     My further inquiries into the JCC bomb threats led me to question how Michael R. Kadar came to enjoy dual Israeli-American citizenship, as reported in DOJ's criminal indictment. The readiest explanation for dual citizenship is birth in the U.S. to a foreign national mother. Our June 17, 2017, letter to DOJ noted that Michael R. Kadar had received a state court *Padilla* warning that a conviction on Kadar's low-level crimes could lead to his deportation as a foreign national. However, there was a discrepancy between Israeli media reports of Michael Kadar's age (17-18 years old, which could justify his trial in Israel as a juvenile) versus the age reported in Illinois court records for Michael R. Kadar (10 years older).

12.     I turned to Dr. Tamar Kadar's research publications to track her travel. Sure enough, Dr. Kadar had been in the United States the same year that Michael R. Kadar was born. While employed by Israel's Institute for Biological Research ("IIBR"), she was a visiting scientist at the United States Army Medical Research Institute of Infectious Diseases ("USAMRIID") and associated federal defense agencies (e.g., Uniformed Services University) during the time period Michael R. Kadar was born.

13.     Incident to my investigation into Michael R. Kadar's birth, I uncovered a compelling reason that our government and Israel would wish to keep Dr. Tamar Kadar out of the public spotlight.

14.     On or about September 15, 2019, I emailed dozens of scientists associated

with USAMRIID a memorandum explaining this compelling reason, attached here

as Exhibit B. The memorandum's timeline summarizes the explosive political

significance of my findings:

Timeline
The evidence discussed above explains that the IIBR developed anthrax that bears
a striking similarity to that used against the U.S. in 2001. The following timeline
explores how and why this was done.
**1990**: An IIBR employee, Dr. Tamar Kadar (associated with my "seemingly
unrelated inquiry") is briefly on leave from IIBR and affiliated with the Uniformed
Services University's ("USU") Department of Neurology in Bethesda. USU has a
close working relationship with USAMRIID.
**1992**: Anthrax and other pathogens are reported to have "disappeared" from
USAMRIID "in the early 1990s..."
**2000**: IIBR reports it has developed an anthrax vaccine that provides "long and
lasting immunity" and "efficient protection from lethal challenge." Handling
anthrax without personal protective equipment could be suicidal if unvaccinated.
**2001**: One week after 9/11, letters containing highly concentrated virulent anthrax
are posted in a Princeton, N.J., public mailbox. Five people died from anthrax
exposure, including two postal workers, illustrating the importance of vaccination
for the person(s) who handled and mailed the letters.
**2002**: Citing Saddam Hussein's development of biological and chemical weapons
of mass destruction, Israel urges U.S. to attack Iraq.
**2003**: Secretary of State Colin Powell makes the U.S. case for invading Iraq: "Less
than a teaspoonful of dry anthrax in an envelope shut down the United States
Senate in the fall of 2001."
**April, 2019**: The U.S. Department of Justice is notified that Dr. Kadar was in
Bethesda in 1990 with access to the USAMRIID.
**July, 2019**: USAMRIID is closed indefinitely. A USAMRIID public affairs
official initially cites "national security" for this unprecedented shutdown, but,
later, points to a faulty water treatment system known since 2018 to pose "no risk
to public health."

6

15.    My insights into this matter hinge on my intimate knowledge of bacteriology and its scientific methods, including the ultra-high centrifugation density gradient method I co-developed with my colleague Matt Meselson. This method is the standard means by which anthrax bacteria are purified and concentrated. Inexplicably, however, there is no chemical forensic evidence that the density gradient method was used to concentrate the anthrax deployed against the United States in 2001. When asked to investigate the 2001 anthrax attacks, the National Academy of Sciences ("NAS") could only scratch its head regarding how the anthrax had been concentrated.

16.    The method of concentration was not the only forensic mystery that stumped the NAS's study committee. The committee also could not explain the high level of silicon and presence of iron in the anthrax. These three mysteries had remained unresolved (at least publicly) until I found a missing link.

17.    The missing link is a 2006 research paper published in the Journal of Analytical Chemistry, attached here as Exhibit C. The paper titled "Concentration of *Bacillus* Spores by Using Silica Magnetic Particles" is authored by four scientists then employed by the IIBR. The paper explains how commercially available silicon/iron nanoparticles can be used to concentrate anthrax ("*Bacillus*" is the Latin name for anthrax). The paper presents two techniques (sonication or a cationic lipid) for infiltrating the magnetic nanoparticles under the anthrax outer

coat ("exposporium") where the particles adhere to the bacteria's inner coat. A magnet is then used to pull the iron-labeled bacterial particles together, i.e., concentrates them. As described by the paper, the "method is simple, efficient, easy to operate, and fast." This technique would leave no forensic evidence consistent with high-speed centrifugation in a density gradient -- the traditional anthrax concentration method. However, the technique would leave lots of silica and iron in the bacteria.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __l__ day of October, 2023, in Eugene, Oregon.


Franklin W. Stahl

# Franklin Stahl Declaration Exhibit A

JOHN W. PHILLIPS
(206) 382-6163
Cell: (206) 484-0016
jphillips@jphillipslaw.com
www.jphillipslaw.com

June 8, 2017

**Sent via email**

G. F. Peterman III, Esq.
Acting United States Attorney
Peter D. Leary, Esq.
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 1702
Macon, GA 31202-1702
Gf.peterman@usdoj.gov

W. Stephen Muldrow, Esq.
Acting United States Attorney
U.S. Attorney's Office
400 North Tampa Street
Suite 3200
Tampa, FL 33602
w.stephen.muldrow@usdoj.gov

Thomas Wheeler, Esq.
Ryan K. Dickey, Esq.
United Stated Department of Justice, Criminal Division
Computer Crime and Intellectual Property Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Tom.Wheeler@usdoj.gov
Ryan.Dickey@usdoj.gov

**Re: *United States v. Kadar*, No. 3:15-MJ 19; *United States v. Kadar*, No. 6:17-MJ-1361**

Gentlemen:

I represent individuals who, while interested in protecting their privacy, would like to draw your attention to evidence that affects the two above-referenced indictments. The evidence they have

June 8, 2017
Page 2

assembled suggests that the defendant in the above indictments, Michael Ron David Kadar ("MRDK"), did not commit the 2017 crimes alleged in the Florida indictment against the Jewish Community Centers (JCC), that those crimes may have larger institutional sponsorship in the Israeli government, and should warrant further investigation by the FBI and Justice Department.

The individual arrested in Ashkelon, Israel on March 23, 2017, and identified in the indictments as MRDK, is described in news reports as an 18-year old man. The man's lawyer has reported that his client has made 5 suicide attempts while in jail.

My clients have evidence that "Michael Ron David Kadar" is, in fact "Michael R. Kadar," ("MRK") who is 27 years old, and until March 21, 2017, resided in New Lenox, Illinois. The photos below are from MRK's Facebook page:





The following photo is of the man arrested in Israel (Israel has banned publication of his identity or complete facial features):

June 8, 2017
Page 3



MRK has a lengthy criminal history (available on the Will County, Illinois, website), primarily for low-level infractions, e.g.,



Among his crimes is a May 3, 2014, charge for domestic battery. In court records, the Illinois state judge admonished MRK as to "United States Citizenship." See *Padilla v. Kentucky*, 130 S.Ct. 1473 (2010) (Sixth Amendment requires that foreign national defendants be warned that guilty plea could lead to deportation):

You should be able to confirm that Illinois-based MRK holds Israeli citizenship.

June 8, 2017
Page 4

On January 30, 2017, MRK was sentenced in Illinois to 94 days for drug possession, which with credit for time already served resulted in his incarceration until March 18, 2017.  MRK's last Facebook post was made three days later, on 3/21/17, shortly after his release from jail. On or about 3/22/17, you should be able to confirm that MRK flew from Chicago to Tel Aviv. On March 23, 2017, MRDK was arrested in Ashkelon, Israel. My clients believe the individual arrested was MRK, recently released from jail an Illinois.  If so, then during most of the 2017 period for which MRDK is accused of having made the Florida JCC bomb threat phone calls, he was incarcerated in the United States. He could not have made those calls.

If the indictee is, in fact, MRK, who could not have made the JCC bomb threats, who did?  My clients believe the chief candidate is his mother, Dr. Tamar Kadar, an Israeli scientist who studies chemical weapons at the top-secret Israel Institute of Biological Research.  Dr. Kadar lives in the Ashkelon apartment in which the arrest was made.  Here is a photo of Dr. Kadar:



Here is a video of Michael Kadar's mother taken after his arrest in Ashkelon. The video shows that his mother has a speech impediment. Kadar's Florida indictment notes that the bomb threat recordings show "a distinct and pronounced speech impediment" (page 24). Many of the bomb threats were made by a female voice.  Dr. Kadar is female.

June 8, 2017
Page 5


Another intriguing line of inquiry relates to one Robert Kadar, also a resident of the
Illinois household in which MRK lived when not incarcerated. This LinkedIn profile refers to an
Israeli Brigadier General Robert Kadar:

> LinkedIn
> https://il.linkedin.com/in/רדק-הרוד-האמיט-613779133
> Ashkelon Area, Israel - Attended Ulpan Beit Canada
> I'm **Brigadier General Robert Kadar** daughter just returned home to Israel, interested
> in military technology, and everything is hi-tech. After learning of the …

Here is the only photo of Robert Kadar available. One can compare Robert Kadar to
the silhouette of Michael Kadar's father in this video and note the distinctly-shaped ear lobes,
frizzy hair, and glasses.

It is possible that Dr. Kadar/Brigadier General Kadar and/or their Israeli government employer
got wind that the Ashkelon-based bomb threat operation was in jeopardy because the FBI had
determined that the JCC bomb threats originated from Israel. The operation needed a fall guy.
MRK, a petty criminal and family ne'er do well, was an attractive candidate. MRK was given a
plane ticket to Israel, departing Chicago on or about March 22, a day after his last Facebook post.
You may find that Robert Kadar was on the same plane. Upon his arrival in Israel, on March 23,
Israeli police arrested MRK at Dr. Kadar's apartment. His age was artificially reduced so that he
could be described as an innocent "teen" and charged as a juvenile, thus justifying Israel's
refusal to extradite him.

My clients are confident that the United States government has the resources to pursue and will
pursue these lines of inquiry:

1) Did MRK fly from Chicago to Tel Aviv on or about March 22, 2017?  If so, where is he now?
Did Robert Kadar accompany MRK on the same flight?

2) If MRK has disappeared and been replaced by a mysterious 18-year old boy who allegedly has
repeatedly tried to commit suicide (and who may conveniently succeed in the near future), then
who made the 2017 JCC bomb threat calls? MRK, lately of Illinois, surely could not have
committed these crimes from a U.S. jail.

These are questions that deserve answers in the pursuit of justice.  The Justice Department also
has a duty to correct or clarify its indictment if those answers are inconsistent with the
indictments.

Very truly yours,


/s/

June 8, 2017
Page 6

John W. Phillips
PHILLIPS LAW GROUP, PLLC
315 Fifth Avenue S. Suite 1000
Seattle, WA 98104-

# Franklin Stahl Declaration Exhibit B

TO: USAMRIID researchers and associates
FROM:  Franklin W. Stahl, Emeritus Professor of Molecular Biology,
University of Oregon
DATE: September 5, 2019
RE:  2001 Anthrax letters

Following the 2001 anthrax letter attack on the U.S., the FBI accused
two of your colleagues of the crimes (others, too, have pointed fingers
at named and unnamed USAMRIID researchers). One was exonerated;
one is alleged to have committed suicide . Thereafter, the FBI closed its
investigation. I can only imagine the effect these events have had on you
and your laboratories; it must have been painful and frustrating.

This year, while pursuing a seemingly unrelated inquiry, I found the
evidence discussed below. It exonerates your former colleagues and
points a finger at a different source altogether for the anthrax letters.

You deserve to know this information.

The Scientific Evidence

In 2011, the National Academy of Sciences released its review of the
scientific evidence considered by the FBI in its investigation. The NAS
agreed with the FBI that the "Ames" strain of anthrax was used in the
letters. The Ames strain was collected originally in 1981 from a dead
cow in Texas and sent to the United States Army Medical Research
Institute of Infectious Diseases (USAMRIID) to develop anthrax vaccines.

However, neither the FBI nor NAS could explain the "significant amounts
of silicon" that were detected "within the spore coat." Because the
silicon was located underneath the anthrax's outer exosporium layer, the
NAS rejected its addition as a dispersant. Experimental attempts to grow
anthrax in a silicon-laced growth medium could account for only one-
tenth the amount of silicon observed in the letters. The NAS could not
explain why "(1) the silicon content was high, (2) most of the silicon was
incorporated in the spore coat, (3) the majority of spores in the samples

contained silicon in the coat, and (4) no silicon was detected in the form of a dispersant in the exosporium."

A 2006 study "*Concentration of Bacillus Spores by Using Silica Magnetic Particles*," published in the Journal of Analytical Chemistry, explains all. This article is not mentioned in any FBI or NAS document.

The 2006 paper describes a "simple, efficient, easy to operate, and fast" way of using magnetically charged silica to concentrate anthrax spores that "will not affect spore viability." A high concentration of spores increases the lethality of exposure. To achieve high spore concentration, the method uses ultrasonic waves to partially disrupt the exosporium layer without harming the spore coat. The spores are then exposed to silica magnetic particles that adsorb to the spores through the damaged exosporium. The paper also presents an alternative to ultrasonic treatment that uses a cationic lipid to adsorb the silica particles to the spores. Both methods result in "rapid concentration and separation of spores bound to silica magnetic particles."

The FBI and NAS should have been alert to the possibility that a novel method had been used to concentrate anthrax spores. The traditional technique is repeated centrifugation through a high-density compound. However, the FBI found that "the most commonly used high-density compound, meglumine diatrizoate, was not detected in the letter material." No one appears to have asked "If not centrifugation, how was the 2001 anthrax concentrated?"

Furthermore, the use of magnetic silica explains the anomalous iron found in the anthrax. According to the NAS report, Sandia National Laboratories thought the iron may be a "useful chemical signature." But, says the NAS committee, it "was never shown any evidence to indicate that this possibility was pursued further or that these discussions led to any conclusions about the source of material or production methods." Magnetic beads, like those used in the 2006 paper, are iron oxide ($Fe_3O_4$) coated with silicon dioxide ($SiO_2$).

In sum, the 2006 paper explains parsimoniously all of the NAS's key silicon (and iron) findings: 1) The method would cause a high silicon

content; 2) the silicon would be underneath the spore's outer layer, thus appearing in an electronic microscope to be incorporated into the spore coat that lies below the exosporium; 3) a majority of the spores would have silicon incorporated; and, 4) the silicon would not play a dispersant function since it is located beneath the exosporium.

What could account for this relevant paper's omission from the exhaustive FBI and NAS studies?

The paper's authors are affiliated with the Israel Institute for Biological Research (IIBR).

Timeline

The evidence discussed above explains that the IIBR developed anthrax that bears a striking similarity to that used against the U.S. in 2001. The following timeline explores how and why this was done.

**1990**: An IIBR employee, Dr. Tamar Kadar (associated with my "seemingly unrelated inquiry") is briefly on leave from IIBR and affiliated with the Uniformed Services University's ("USU") Department of Neurology in Bethesda. USU has a close working relationship with USAMRIID.

**1992**: Anthrax and other pathogens are reported to have "disappeared" from USAMRIID "in the early 1990s…"

**2000**: IIBR reports it has developed an anthrax vaccine that provides "long and lasting immunity" and "efficient protection from lethal challenge." Handling anthrax without personal protective equipment could be suicidal if unvaccinated.

**2001**: One week after 9/11, letters containing highly concentrated virulent anthrax are posted in a Princeton, N.J., public mailbox. Five people died from anthrax exposure, including two postal workers, illustrating the importance of vaccination for the person(s) who handled and mailed the letters.

**2002**: Citing Saddam Hussein's development of biological and chemical weapons of mass destruction, Israel urges U.S. to attack Iraq.

**2003**: Secretary of State Colin Powell makes the U.S. case for invading Iraq: "Less than a teaspoonful of dry anthrax in an envelope shut down the United States Senate in the fall of 2001."

**April, 2019**: The U.S. Department of Justice is notified that Dr. Kadar was in Bethesda in 1990 with access to the USAMRIID.

**July, 2019**: USAMRIID is closed indefinitely. A USAMRIID public affairs official initially cites "national security" for this unprecedented shutdown, but, later, points to a faulty water treatment system known since 2018 to pose "no risk to public health."

The USAMRIID shutdown may help preserve evidence related to the above timeline. It may also offer an opportunity to replicate, in secret, the 2006 methodology and compare the results to the 2001 anthrax samples. A faulty water treatment system that poses no risk to public health could be fixed, too.

*The author benefitted from discussions with several U.S. and Israeli colleagues, including two members of the NAS study committee, a long-time anthrax bioweapons researcher, and an author of the 2006 Bacillus/silica study. The conclusions herein are the author's own. I welcome feedback by email to fstahl@uoregon.edu or my cell phone at (541) 393-4885.*

# Franklin Stahl Declaration Exhibit C

# Concentration of Bacillus Spores by Using Silica Magnetic Particles

Shmuel Yitzhaki,* Eran Zahavy, Chaya Oron, Morly Fisher, and Avi Keysary
Israel Institute for Biological Research
P.O. Box 19
Ness-Ziona 74100
Israel

* Corresponding author. E-mail: yitzhaki@iibr.gov.il.

6670 Analytical Chemistry, Vol. 78, No. 18, September 15, 2006 10.1021/ac060497g CCC: $33.50 © 2006 American Chemical Society
Published on Web 07/26/2006

Silica particles are mainly used for the concentration of nucleic acid for diagnostic purposes. This is usually done under acidic or chaotropic conditions that will demolish most of the living organisms and prevent the application of other diagnostic tests. Here we describe the development of a method for the capturing and concentration of Bacillus spores using silica magnetic particles to enable fast and sensitive detection. We have shown that capturing various Bacilli spores via silica magnetic particles is limited, with large differences between spore batches (42) (25%). The hydrophobic exosporium layer of spore limits the capture by the hydrophilic silica beads. Partial removal of Bacillus exosporium increases capture efficiency.

To increase capturing efficiency without harming the spores' viability, a cationic lipid, didecyldimethylammonium bromide (DDAB), was used as a coat for the negatively charged silica particles. DDAB treatment increased capture efficiency from 42% to more than 90%. Using this method, we were able to capture as few as 100 Bacillus anthracis spores/mL with 90% efficacy. Release of captured spores was achieved by the addition of albumin. The capture and release processes were verified by plating and by flow cytometry using light scatter analysis. The method is simple, efficient, easy to operate, and fast.

The ultimate goal of novel methods for pathogen detection is to significantly improve sensitivity and reduce detection time. Detection of Bacilli pathogenic spores is highly important in the era of bioterror threats. Many methods for pathogen detection are available (1,2) some of which require a period of growth that demands at least 1 day for the target microorganism to reach detectable levels. Detection methods could be improved if the bacteria to be detected are separated and concentrated. The technique chosen for pathogen concentration has to provide high recovery of the pathogen, preferably without disrupting bacterial cell viability. Methods for bacterial concentration were reviewed (3-6) and rely on specific immunoseparation, or adsorption, which is mediated through nonspecific interactions, including van der Waals forces, electrostatic interactions, hydrophobic interactions, and hydrogen bonding. (7-9) These methods include use of ion-exchange Resin (10) for recovery of Pseudomonas cepacia, reported to be 35% efficient. Others (11,12) used metal hydroxides to concentrate food-borne bacteria from nonfat dry milk with recovery efficiency exceeding 75%.

Despite its potential for adsorption and concentration of organic molecules, the use of silica particles for bacteria concentrate is not widely reported. Silica particles are highly porrosive with high surface area, hence used for the adsorption of DNA, RNA, or viruses for detection purposes, as has been examined by several researchers. (13-16)

Here we report the development of an analytical method for the concentration of Bacilli spores based on the adsorption to silica magnetic particles using cationic lipid. Moreover, following adsorption, the spores can be released from the particles by the addition of proteins such as IgG molecules or albumin. Both processes are rapid and will not affect spore viability, which make them applicable to any type of analysis.

MATERIALS AND METHODS

Materials. MagPrep, magnetic silica particles, was purchased from Merck Chimie France. The cationic surfactant didecyldimethylammonium bromide (DDAB) from Aldrich. The Bacillus spore strains, Bacillus subtilis var niger, Bacillus subtilis (168), Bacillus thuringiensis thuringiensis (BTT), and Bacillus anthracis ATCC ¢14185 (a Tox- Cap-) strain, (17) were all obtained from the Israel Institute for Biological Research culture collection.

The purity of the spores was monitored by light microscopy: all spores samples are above 95% purity. The polyclonal antibody specific to B. anthracis spores was prepared in rabbits as previously described. (18) The polyclonal antibody, IgG, was reacted with the fluorophore Alexa 488 (molecular probes A-10235) to receive the fluorescent conjugate IgG-A488. (19)

Spore Preparation. A 16 h of bacterial culture in Bacto Tryptose broth was diluted into sporulation medium G20 in an Erlenmeyer flask (well-aerated) that was shaken (250 rpm) at 34 °C for 48 h. Spores were centrifuged at 8000g for 30 min, washed several times with cold distilled water, and stored frozen at -20 °C.

Spore-MagPrep Reaction. To 1 mL of PBS spore suspension, 15 íL of MagPrep solution and 1 íL of 20 mM DDAB were added. The mixture was incubated for 5 min and then subjected to a magnetic field. The supernatant and the magnetic particles containing pellet were plated on brain heart infusion agar plates and incubated 18 h at 37 °C. Colonies from the supernatant and pellet were counted, and the percent of adsorption was calculated by the ratio of the number of spores in the pellet to the total spores (supernatant + pellet). For detachment of the spore-MagPrep complex, bovine serum albumin (BSA) was added to the solution, 2% final concentration. Spores were released immediately upon addition of BSA.

Electron Microscopy. Formaldehyde-treated ATCC ¢14185 spores were centrifuged for 10 min at 10000g. The spore pellet was fixed overnight in cold 2.5% glutaraldehyde, postfixed for 3 h at 4 °C in 1% osmium tetraoxide, and dehydrated in increments of ethanol. Slices were embedded in Epon, sectioned with an OMU-2 Reichert ultramicrotome. The sections were examined using a JEOL S100 electron microscope.

Sonics & Materials. Samples of "sonicated" spores were treated for 1 min, 3 times in model Vibra Cell vcx600 sonicator.

Flow Cytometry (FCM). Experiments were performed on a Becton-Dickinson flow cytometer, FACSCalibur model. Analyses were performed using CellQuest. The instrument setting included logarithmic amplifiers on all detectors as described previously for bacteria analysis. (19,21)

RESULTS

Adsorption Properties of Bacillus Spores on Silica Magnetic Particles. The adsorption capability of different types of Bacillus spores to MagPrep was measured as described in Materials and Methods. The supernatant and the magnetic particles containing pellets were plated and colonies were counted. The adsorption percentage was calculated by the ratio of the number of spores in the pellet to the total spore count (supernatant + pellet). The adsorption average of B. anthracis, thuringiensis, and subtilis spores was 42 (25% ranging from 5 to 82%).

Due to the fact that spores are highly resistant in acidic condition and that such conditions can improve the adsorption efficiency, these experiments were also performed with B. anthracis spores in pH range of 2-5. However, similar results of low-efficiency capturing were obtained (data not shown). The low adsorption level of the spores to silica may stem from the hydrophobicity of the exosporium layer surrounding the spore as reported previously in the literature. (22,23) The large standard deviation in adsorption levels may be attributed to variability of the exosporium layer resulting from the spore preparation, which may mask hydrophilic sites.

To expose hydrophilic sites, we used ultrasonic waves to uncoat the B. anthracis spores. Using a transmission electron microscope, we demonstrated that spore sonication partially disrupted the exosporium layer, but did not harm the spore coat (Figure 1). Spore samples that were treated by sonication were introduced to Mag-Prep for adsorption measurements. These samples have been adsorbed to silica magnetic particles (Mag- Prep) with adsorption efficiency of 85 +/- 10% (for three repeated experiments). The treated spores had higher adsorption efficiency with better reproducibility compared to untreated spores. This suggests that in order to ensure good adsorption between the silica particles and the spores, a linker between the hydrophobic sites of the spores' outer surface and the hydrophilic particles should be used.

To form such an interaction, a cationic surfactant with hydrophobic tails DDABs was used. Adsorption experiments with several Bacilli spore strains to the silica particles were performed in the presence of DDAB. Using different DDAB concentrations, 0, 0.002, 0.02, and 0.2 mM, adsorptions of 10, 45, 90, and 50%, respectively, were measured. These results demonstrate that adsorption is DDAB concentration dependent with an optimum value of 0.02 mM DDAB.

Increasing concentration results in a decrease in adsorption efficiency, apparently due to micelle formation of the cationic surfactant. Testing several species of Bacilli spores, BTT, B. subtilis var niger, B. subtilis 168, and B. anthracis, in a concentration range of 100-106 cfu/mL, it

was demonstrated that the addition of DDAB (0.02 mM) significantly increased adsorption efficiency to a level of 90%. Moreover, the adsorption method had been tested in spiked environmental samples. We found that the adsorption efficiency decreased to 20% probably due to site competition of DDAB with organic substances in the samples. The capturing efficiency increases to 50-70% after addition of DDAB to a concentration level to 0.2 mM. These data suggest that the method is applicable in environmental samples.

Detachment Properties of Bacillus Spores from Silica Magnetic Particles.

One of the main advantages of this method is the rapid concentration and separation of spores bound to silica magnetic particles. However, some processes (such as analysis) require detachment of spores from the particles. The detachment process should not involve a destructive method, since it might alter spore structure and may affect the analysis. The adsorption described above is based on the hydrophobic interaction between spores and DDAB alky moieties on one side and on the hydrophilic interaction of the polar groups of DDAB with silica particle surface. Any competition-binding agent, like proteins, can easily interrupt such interactions. For example, we have used BSA as a competition-binding agent to release the attached spores from the silica magnetic particles. Upon addition of 2% BSA to the particles/spores solution, 97% of the captured spores were released from the particles to the supernatant phase, as revealed by the plating procedure described in Materials and Methods.

FCM Analysis of Adsorption and Detachment of Bacillus Spores from DDAB-Coated Silica Magnetic Particles.

FCM analysis of silica magnetic particles enabled us to study the mechanism of adsorption and detachment of spores in various conditions. Moreover, by the FCM analysis, we demonstrated spore detection and analysis after detachment.

FCM analysis of particles is primarily based on light scatter parameters (forward scatter, side scatter). Figure 2 presents the dot plot analysis of DDAB-coated silica magnetic beads (Figure 2A) and with 1 106 spores attached to the beads (Figure 2B). After the addition of spores, the events related to beads shift to higher forward and side scatter values and they are less dispersed. This can be attributed to the bead-spore complex, which is bigger. This fits the bead-spore complex diameter, which is 1-2 ím. In both dot plots (Figure 2A and B) there was no indication of major free spore population (R2) as observed with free spores samples (data not shown). Upon addition of fluorescent conjugate IgG-A488 to the mixture, free spores appear in region R2 (Figure 2C), which is a characteristic light scatter of spores. Moreover, in the fluorescence dot plot of the sample (Figure 2C) the spore population exhibits its typical fluorescence labeling (region R1) as for free spores (data not shown). The phenomenon of spore detachment was repeated with several proteins having no specific spore recognition, such as anti-mouse IgG molecules or 2% BSA, as shown in Figure 2D. This supports the conclusion that the bead-spore complex is decomposed, as described by the plating experiments.

DISCUSSION

In this paper, we developed a method for concentration of Bacilli spores by adsorption to silica magnetic particles using cationic lipid DDAB. The addition of DDAB increases the adsorption efficiency from 40 to 90%, as shown by plating.

The cationic lipid requirement for adsorption suggests that the outer layer of the spore, the exosporium, has hydrophobic characteristics. This conclusion is supported by the partial removal of this layer by sonication as shown by TEM analysis. The treated spores adsorb to the same silica beads in a higher adsorption yield with no DDAB addition. Indeed, the exosporium's hydrophobicity has been demonstrated by several researchers using different methods. (24,25)

The release of live spores from the particles following adsorption is an important step in analysis, especially when enumeration of spores is needed. A method that requires the alteration of pH and adjustment of salt concentration, such as ion-exchange resin, for the adsorption and release of captured bacteria, may affect bacterial viability. In this paper, we demonstrate the complete release of live spores from silica particles by immunoglobulins and albumin.

The process of adsorption and detachment has been demonstrated using FCM analysis and plating. The FCM work enabled us to have direct observation of the spore-particle interaction and the effect of the added proteins to that complex. This analysis has shown that the spores remain intact (by shape, size, and immunostaining) and that there was no germination during the process. In addition, the FCM analysis is presented as a fast immunodiagnostic method following the adsorption process.

The desorption process induced by the presence of proteins suggests that this method is aimed to concentrate spores from environmental samples, such as water, and not clinical samples containing high protein concentration and bacterial vegetative cells. We also found that in environmental sample one should expect decrease in the adsorption efficiency from 90 to 50-70%; hence, the method would highly fit to water or indoor samples. The whole process is rapid (minutes), and spores can be further analyzed by immunological or genetic tests or by plating.

(1) Lim, D. V.; Simpson, J. M.; Kearns, E. A.; Kramer, M. F. Clin. Microbiol. Rev. 2005, 18, 583-607.
(2) Higgins, J. A.; Ibrahim, M. S.; Knauert, F. K.; Ludwig, G. V.; Kijek, T. M.; Ezzel, J. W.; Courtney, B. C.; Henchal, E. A. Ann. N. Y. Acad. Sci. 1999, 894, 130-148.
(3) Stevens, K. A.; Jaykus, L.-A. Crit. Rev. Microbiol. 2004, 30, 7-27.
(4) Payne, M. J.; Kroll, R. G. Trends Food Sci. Technol. 1991, 2, 315-319.
(5) Sharp, A. N. In Food Microbilogical Analysis: New Technologies; Tortorello, M. L., Gendel, S. M., Eds.; Marcel Dekker: New York, 1997.
(6) Wilson, I. G. Appl. Environ. Microbiol. 1997, 63, 3741-3751.

(7) Zarate, G.; Morata, D. A., V. I.; Chaia, A. P.; Gonzaez, S. N. J. Food Prot. 2002, 65, 534.

(8) Lukasik, J.; Bradley, M. L.; Scott, T. M.; Hsu, W. Y.; Farrah, S. R.; Tamplin, M. L. J. Food Prot. 2001, 64, 292.

(9) Glantz, P. J.; Arnebrant, T.; Nylander, T.; Baier, R. E. Acta Odontol. Scand. 1999, 57, 238.

(10) Jacobsen, C.; Rasmussen, O. Appl. Environ. Microbiol. 1992, 58, 2458.

(11) Cullison, M. A.; Jaykus, L.-A. J. Food Prot. 2002, 65, 1806-1810.

(12) Lucore, L. A.; Cullison, M. A.; Jaykus, L.-A. Appl. Environ. Microbiol. 2000, 66, 1769-1776.

(13) Boom, R.; Sol, C.; Weel, J.; Lettinga, K.; Gerrits, Y.; van Breda, A.; Wertheim-Van Dillen, P. J. Virol. Methods 2000, 84, 1-14.

(14) Gibson, K. M.; Mori, J.; Clewley, J. P. J. Virol. Methods 1993, 43, 101-109.

(15) Hafliger, D.; Gilen, M.; Luthy, J.; Hubner, P. Int. J. Food Microbiol. 1997, 37, 27-36.

(16) Pallin, R.; Wyn-Jones, A. P.; Place, B. M.; Lightfoot, N. F. J. Virol. Methods 1997, 67, 57-67.

Anal. Chem. 2006, 78, 6670-6673

(17) Cohen, S.; Mendelson, I.; Altboum, Z.; Kobiler, D.; Elhanany, E.; Bino, T.; Leitner, M.; Inbar, I.; Rosenberg, H.; Gozes, Y.; Barak, R.; Fisher, M.; Kronman, B.; Velan, B.; Shafferman, A. Infect. Immun. 2000, 68, 4549-4558.

(18) Fisher, M.; Weiss, S.; Kobiler, D.; Levi, H.; Altboum, Z., Nice, France, 2003; P207.

(19) Zahavy, E.; Fisher, M.; Bromberg, A.; Olshevsky, U. Appl. Environ. Microbiol. 2003, 69, 2330-2339.

(20) Hanson, R. S.; Srinvasan, S.; Halvorson, H. O. J. Bacteriol. 1963, 85, 451-455.

(21) Yitzhaki, S.; Barnea, A.; Keysary, A.; Zahavy, E. J. Clin. Microbiol. 2004, 42, 1680-1685.

(22) Waller, L. N.; Fox, N.; Fox, K. F.; Fox, A.; Price, R. L. J. Microbiol. Methods 2004, 58, 23-30.

(23) Sousa, J. C. F.; Silva, M. T.; Balassa, G. Nature 1976, 263, 53-54.

(24) Koshikawa, T.; Yamazaki, M.; Yoshimi, M.; Ogawa, S.; Yamada, A.; Watabe, K.; Torii, M. J. Gen. Microbiol. 1989, 135, 2717-2722.

(25) Ronner, U.; Husmark, U.; Henrikson, A. J. Appl. Bacteriol. 1990, 69, 550-556.

Figure 1. TEM micrographs (magnification 40000) of cross-sectioned B. anthracis ATCC ¢14185 spores: (A) Intact spores, exosporium (EX), spore coat (SC), and cortex (CX) are clearly distinguished. (B) Spores after 60 s of sonication. Arrows indicate absence of exosporium layer.

Figure 2. FCM light scatter (FSC/SSC) dot plots of silica magnetic particles (A) alone, (B) after adsorption of Bacillus spores in PBS + 0.02mM DDAB, (C) after addition of IgG-Alexa488 to (B), (C¢) fluorescence (FL1/SSC) dot plot of (C), and (D) after addition of 2% BSA to B. R1 represents fluorescence gate for labeled spores with IgG-Alexa488. R2 represents light scatter gate for free spores. R3 represents light scatter gate for free silica particles. R4 represents light scatter gate for silica particles adsorbed with spores.